UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carla Good, *et al.*,                                                    Case No. 3:21-cv-116

               Plaintiffs,

      v.                                                    MEMORANDUM OPINION
                                 AND ORDER

Ohio Department of Rehabilitation
and Correction, *et al.,*

               Defendants.


## I.      INTRODUCTION

Plaintiffs Carla Good and Suzanne Leedy[1] are employed as corrections officers at the Toledo

Correctional Institution ("ToCI"), a high-security prison within the Ohio Department of

Rehabilitation and Correction ("ODRC").  They filed suit against ODRC and various ODRC

employees, alleging that they have been subjected to discrimination on the basis of their sex and a

hostile work environment in violation of Title VII of the Civil Rights Act of 1964.  (Doc. No. 1).

Plaintiffs subsequently abandoned their claims against the individual Defendants.  (*See* Doc. Nos. 14

and 27).

ODRC moved for summary judgment.  (Doc. No. 72).  Plaintiffs filed a brief in opposition,

(Doc. No. 77), and ODRC filed a brief in reply.  (Doc. No. 81).  ODRC also filed a motion to

---

[1]  Leedy is listed on the Court's docket as "Suzanne Trowbridge," though she has changed her name since this case began.  (*See* Doc. No. 54 at 7).  I will use her current name throughout this opinion.

exclude two documents filed with Plaintiffs' opposition brief.  (Doc. No. 80).  Briefing on that motion is complete.  (Doc. Nos. 82 and 84).

Plaintiffs filed a motion for leave to file a sur-reply to ODRC's reply in support of its motion for summary judgment.  (Doc. No. 83).  ODRC opposed that motion and, in the alternative, sought leave to file a response to Plaintiffs' proposed sur-reply.  (Doc. No. 85).

For the reasons stated below, I grant ODRC's motion to exclude evidence, as well as the parties' motions for leave to file additional briefing.  I deny ODRC's motion for summary judgment.

## II.    BACKGROUND

Suzanne Leedy began working as a Corrections Officer at ToCI in October 2000, while Carla Good has worked as a Corrections Officer at that institution since September 2013.  (Doc. No. 27 at 3).  Good and Leedy contend that throughout their employment, ODRC has failed to take reasonable steps to adequately respond to severe and pervasive sexual misconduct by inmates directed at them and other female Corrections Officers.

Leedy worked in ToCI's medical unit prior to 2020 before transferring to the educational unit.  (Doc. No. 54 at 46-50).  Good did not have a permanent post and was assigned to fourth shift special duty relief.  (Doc. No. 56 at 40).  She typically learned of her assigned post each morning during roll call.  (*Id.* at 46).  At times, a supervisor would pull Good from her assigned post and move her to a constant watch post.  (*Id.*).  Constant watch refers to a supervision protocol for an incarcerated individual who has threatened to harm himself.  (*Id.* at 54-55).  A corrections officer assigned to constant watch must maintain visual contact with the inmate at all times and document the inmate's activity at least every 15 minutes.  (*Id.* at 55).

ODRC "oversees 28 correction facilities across Ohio and houses approximately 45,000 adult offenders for a range of convictions such as drug offenses, felony assaults, human trafficking, rape, and murder."  (Doc. No. 72-3 at 1).  ODRC assigns inmates to different institutions in part based

upon an inmate's security level, which can range from level 1 to level 4/ level E. (Doc. No. 72-1 at 6). Level 4 is ODRC's highest security level and inmates at that security level are primarily housed at one of three prisons – ToCI, Southern Ohio Correctional Facility, and Ohio State Penitentiary. (*Id.*). Level E inmates are a subset of Level 4 inmates made up of those individuals who have been placed in restrictive housing. (Doc. No. 32-1 at 2). Level 4 inmates, including those classified as level E, make up approximately 75% of the inmates housed at ToCI. (*Id.*). Level 4 inmates who are not classified as level E are placed in general population. (*Id.*). The remainder of the inmates at ToCI are level 2 or level 3 inmates, who are placed in protective custody units. (*Id.*).

An inmate's security level is determined based on several different factors, including a dangerousness assessment and the amount and type of supervision the inmate requires. (Doc. No. 72-1 at 6). Security levels are reviewed at least annually. (*Id.* at 4). But inmates may receive a special review in certain circumstances, such as when ODRC has obtained new information about the inmate or when the inmate has been found guilty of serious misconduct in the institution. (*Id.*).

Incarcerated individuals are subject to rules from various sources, including the Inmate Rules of Conduct found in Ohio Administrative Code § 5120-9-06. These rules cover topics ranging from computer and telephone usage to personal property and contraband to physical acts of misconduct, including sexual misconduct. *See* Ohio Admin. Code § 5120-9-06(C). One category of sexual misconduct was commonly referred to in ODRC institutions as "Rule 14" violations.

At the time this litigation began, Rule 14 of the Inmate Rules of Conduct prohibited inmates from engaging in "[s]eductive or obscene acts, including indecent exposure or masturbation; including, but not limited to, any word, action, gesture[,] or other behavior that is sexual in nature and would be offensive to a reasonable person." (Doc. No. 54-9 at 63). In April 2022, Rule 14 was amended to prohibit "[s]eductive or obscene acts, including but not limited to:

(a) Non-exhibitionist seductive or obscene acts,

3

(b) Indecent exposure, exhibitionistic masturbation, or exhibitionist obscene acts, including but not limited to masturbating while watching an individual or any act of intentional aggression towards another person in an attempt to cause threat, harm or humiliation, [and]

(c) unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by an inmate toward another person.

(Doc. No. 54-19 at 2-3).

Around the same time, ODRC classified Rule 14 violations "as Tier 1 offenses of a violent nature." (Doc. No. 56-15 at 1). "Tier 1 offenses may result in additional time in prison for any person who is sentenced under Senate Bill 201 . . . and are considered violent offenses when calculating a supervision risk score . . . ." (*Id.*). Further, "any person reporting a Rule 14 violation shall be given the same consideration as any other staff member who is the victim of a violent offense." (*Id.* at 1-2).

ODRC policies require staff members to file an incident report, a conduct report, or both, in certain circumstances. (Doc. No. 32-1 at 2). Incident reports cover "any serious, dangerous, or non-routine event at one of the Department's institutions that an employee feels needs reported and addressed by the institution." (*Id.*). A conduct report is "intended to notify prison administration of an incarcerated individual who violates prison and departmental rules." (*Id.*).

When a corrections officer files a conduct report, the report first is referred to a hearing officer. (Doc. No. 72-1 at 6). Hearing officers review all conduct reports within an assigned housing area and typically are sergeants who were not involved in or a witness to the event in question. (*Id.*). A hearing officer has four options when reviewing a conduct report: (1) return the conduct report to the corrections officer who wrote it for clarification; (2) withdraw the conduct report or find the inmate not guilty; (3) find the inmate guilty and impose certain, limited sanctions; or (4) refer the conduct report to the Rules Infraction Board ("RIB"). (*Id.* at 6-7). If the hearing officer finds the inmate guilty, the officer may place the inmate in Limited Privilege Housing or

4

impose a "privilege restriction or behavioral requirement such as commissary restriction,[2] radio/tablet restriction, telephone restriction, visiting restriction, recreation restriction, and extra duty." (*Id.* at 7). Additionally, the hearing officer may order an inmate found guilty of Rule 14 violations to wear a one-piece jumpsuit rather than the shirt and pants typically worn by incarcerated individuals. (*Id.*).

Each ODRC institution has an RIB, which is a panel consisting of a permanent chairperson and "one to two additional panelists who rotate daily." (*Id.*). Any staff member who has received RIB training and certification may serve as a panelist. (*Id.*). The RIB has wider discretion and may impose more severe sanctions, including up to 180 days in restrictive housing. (*Id.*). It also may refer an incarcerated individual for a special review of the individual's security level. (*Id.*).

Another available sanction is the use of sliders or magnets on the windows of a cell door. A slider is "a metallic shield [installed on a cell door] that can be opened and closed by correction officers when looking into an inmate's cell to verify the inmate is in their cell and/or not in distress." (Doc. No. 72-9 at 3). If there is not a cell with an attached slider available, corrections officers can place "a magnetic strip . . . over an incarcerated person's cell door window, . . . [which] can be easily peeled back for the correction[s] officer to look into an incarcerated person's cell." (*Id.* at 4).

Harold May, who served as the warden at ToCI during a portion of the time period at issue in this case, directed some changes to a sanctions grid used to guide the imposition of progressive discipline for first and repeat violations of certain Inmate Rules of Conduct. (Doc. No. 59 at 20; Doc. No. 72-4). The grid offers two tracks for sanctions – one involving placement in limited privilege housing and the other involving placement in restrictive housing. On the limited privilege housing track, an inmate could face the following disciplinary measures:

---

[2] The prison commissary is "essentially a store . . . that sells a wide array of products[, including] . . . food, hygiene products, periodicals, postage, over the counter medicine, and phone call time cards." (Doc. No. 72-6 at 5).

- First offense – 29-60 days limited privilege housing, commissary restriction, removal of all electronics for 30 days, and a jumpsuit sanction for 30 days.

- Second offense – 90 days limited privilege housing, commissary restriction, removal of all electronics for 30 days, and a jumpsuit sanction for 60 days.

- Third offense – 150-180 days limited privilege housing, commissary restriction, removal of all electronics for 30 days, a jumpsuit sanction for 90 days, and the consideration of a "slider restriction depending on circumstance."

(Doc. No. 72-4 at 1).

The grid then recommends more severe sanctions involving restrictive housing:

- First offense – 29-60 days restrictive housing, commissary restriction, removal of all electronics for 30 days, and a jumpsuit sanction for 30 days.

- Second offense – 90-145 days restrictive housing, commissary restriction, use of a slider, removal of all electronics for 30 days, and a jumpsuit sanction for 60 days.

- Third offense – 180 days restrictive housing, commissary restriction, use of a slider until the inmate has not had any Rule 14 violations for six months, removal of all electronics for 30 days, and a jumpsuit sanction for 90 days.

(Doc. No. 72-4 at 1).

The RIB is expected to tailor sanctions to each individual's circumstances, including utilizing sanctions which are more likely to impact that individual's behavior and reducing usage of sanctions which are unlikely to be effective, such as visiting restrictions for an incarcerated individual who rarely has visitors.  (Doc. No. 59 at 21-22).

An incarcerated individual who is sanctioned for violating Rule 14 does not necessarily have to serve the full term of their institutional sanctions.  ODRC attempts to incentivize compliance with institutional rules by making an incarcerated individual eligible for an early release from sanctions once the individual has served half of the sanctions term, if the individual has demonstrated compliance with the sanctions and other rules.  (Doc. No. 72-6 at 3).  A unit manager typically makes the decision whether to release an incarcerated individual early from his sanctions.  (Doc. No. 59 at 33).

Sonrisa Sehlmeyer served as the Warden's Assistant at ToCI from 2016 until February 2022. (Doc. No. 58 at 14).  Sehlmeyer's general responsibilities in that role included acting as the public information officer, responding to public records requests, overseeing the training officer and the Prison Rape Elimination Act compliance officer, and overseeing the RIB, among other tasks.  (*Id.* at 15).  During May's tenure as warden at ToCI, Sehlmeyer served on the Rule 14 committee, along with unit managers, sergeants, corrections officers, and other administrative staff members.  (*Id.* at 50).  Any staff member who wanted to join the committee could participate in its monthly meetings, though May instructed Sehlmeyer to extend invitations to corrections officers who wrote a lot of Rule 14 conduct reports, as well as other corrections officers who raised concerns related to Rule 14 violations while Sehlmeyer conducted rounds.  (*Id.* at 50-52).

Sehlmeyer also chaired a subcommittee of the Rule 14 committee, made up of unit managers, deputy wardens, and herself.  (*Id.* at 52).  This subcommittee generally met on a weekly basis and sought to "come up with creative strategies" to address Rule 14 violations by incarcerated individuals.  (*Id.* at 52-53).  Sehlmeyer testified that the subcommittee's work led to the implementation of a procedure in which an inmate's current sanctions were listed on a piece of paper posted on the cell door so that a corrections officer or other staff member could quickly see those sanctions.  (*Id.* at 54).  Additionally, a binder containing information on the sanctions imposed on each incarcerated individual in a housing unit was placed at the officers' station in the unit.  (Doc. No. 72-9 at 3); (*see also* Doc. No. 62-6) (email dated April 27, 2021, implementing the use of binders in housing units) (filed under seal).

Annette Chambers-Smith became the Director of ODRC in February 2019.  (Doc. No. 60 at 14).  Early on in her tenure, Chambers-Smith met with Chris Mabe, the head of the union which represents various classes of state employees, including corrections officers.  (*Id.* at 27).  Among the topics the two discussed was the prevalence of Rule 14 violations.  (*Id.*).  Chambers-Smith believed

"the people that were inside the prison felt that nothing at all was being done about it," and she wanted to ensure ODRC addressed issues with Rule 14 misconduct and communicated those new procedures to staff members.  (*Id.*).  Chambers-Smith directed that a Rule 14 violation would be subject to "the highest level of a sanction in the department."  (*Id.* at 28).

In September 2019, ODRC distributed to its employees a video recording in which Chambers-Smith discussed Rule 14 violations and expressed her belief that there should be "zero tolerance" for an inmate's violation of Rule 14.  (*Id.* at 32).  She described an incident in the early 1990s, in which an inmate was masturbating through his clothes while in the front row of an orientation class Chambers-Smith was conducting.  (*Id.* at 33).  Chambers-Smith did not write a conduct report on the inmate's misconduct because other staff members would often question why a female staff member would write the report "or even asking what they did to cause it."  (*Id.* at 34).

After she became the Director of ODRC, Chambers-Smith conducted a site visit to ToCI. While talking with an inmate through his cell door, Chambers-Smith realized the inmate was masturbating his exposed penis while she was talking with him.  (*Id.* at 36).  Chambers-Smith asked a nearby corrections officer if he was going to write a conduct report for the Rule 14 violation or if Chambers-Smith should.  (*Id.*).  The officer responded that he would write the conduct report, but Chambers-Smith subsequently learned the officer did not do so.  (*Id.*).  When Chambers-Smith asked why the conduct report was not written, she "didn't get an answer to that."  (*Id.*).  Afterwards, a conduct report was filed, and the inmate later pled guilty.  (*Id.* at 36-37).

Other central office ODRC personnel played roles in the department's Rule 14 efforts as well.  Nicolle Wampler is a Project Manager over Employee Services Team with ODRC.  In that role, she supervises and coordinates efforts for peer support for employees and is responsible for providing support services to staff members, such as training or referral to outside resources, including the Employee Assistance Program.  (Doc. No. 55 at 10-11).

In April 2021, Wampler circulated an email to ODRC employees introducing a "Report and Support campaign." (Doc. No. 55-6 at 1). The purpose of this campaign was to "support female staff [members] who have been sexually victimized by an incarcerated person, educate staff [members] about the victimization, and ultimately to unify as a Department with a single message that this behavior is not acceptable." (*Id.*). The email also contained suggestions on how staff members could support other staff members who were the victims of a Rule 14 violation. (*Id.* at 3). Wampler also drafted and circulated a PowerPoint presentation discussing Rule 14 violations and the impact that misconduct may have on staff members who are subjected to it.[3] (Doc. No. 55-7).

Chambers-Smith released another Rule 14 video in 2022, discussing changes to Rule 14 in the Ohio Administrative Code. (Doc. No. 60 at 79-80). (*See also* Doc. No. 54-19 at 2-3). Chambers-Smith also intended that the video offer support to female staff members who disclosed that male staff members often questioned them about the content of their Rule 14 conduct reports. (Doc. No. 60 at 81).

ODRC also has two other options to address Rule 14 violations at its disposal. ODRC personnel may contact a local prosecutor's office to request that an incarcerated person who committed a Rule 14 violation be prosecuted. (Doc. No. 72-1 at 9). But, as ODRC concedes, "local prosecutors have expressed resistance" to pursing these cases because any jail time would be served concurrently with the inmate's felony sentence." (*Id.*) As a result, "few, if any, misdemeanor offenses committed by incarcerated persons while in prison are prosecuted." (*Id.* at 10).

The second option involves requesting that the Ohio Parole Board extend the minimum sentence of eligible inmates who violate certain Inmate Rules of Conduct, including Rule 14. (*Id.* at

---

[3] While Defendant refers to this presentation as a "training," (Doc. No. 72 at 23), it is unclear whether Defendant had any way of monitoring how many or which ODRC employees viewed the presentation. Defendant later created an electronic training program on Rule 14 violations in 2023. (Doc. No. 72-6 at 3-4).

10-11).  The Parole Board may impose "up to one-half of the incarcerated individual's minimum sentence," though most hearings result in the imposition of one year or less of additional time.  (*Id.* at 11).

But Good and Leedy contend that these sanctions are not consistently enforced at ToCI and have not had any impact on Rule 14 violations by individuals incarcerated.  Leedy testified that, "[s]ince August of 2020, . . . the number of penises that [she's] . . . seen [and] . . . the number of masturbations that [she's] . . . had to witness . . . has stayed the same.  Nothing has changed."  (Doc. No. 54 at 143).  In 2020, ToCI inmates were held to have committed 866 Rule 14 violations.  (Doc. No. 55-7 at 13).  This total nearly equaled the number of Rule 14 violations at the other two Level 4 facilities – Southern Ohio Correctional Facility and Ohio State Penitentiary – combined, though ToCI housed roughly half the number of inmates as those two facilities.[4]  (*Id.*)

Good filed a charge of discrimination with the Equal Employment Opportunity Commission on July 27, 2020, asserting she had been forced to work in a sexually hostile work environment.  (Doc. No. 56-18).  Leedy filed a separate charge on August 4, 2020.  (Doc. No. 54-2).  After receiving their right to sue letters, Good and Leedy initiated this litigation.

### III.    STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  All evidence must be viewed in the light most favorable to the nonmovant and all reasonable inferences are drawn in the nonmovant's favor.  *See, e.g., Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (citing cases).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[4]  As of December 29, 2020, ToCI had 801 inmates.  (Doc. No. 55-7 at 13).  Southern Ohio Correctional Facility recorded 434 Rule violations from its inmate population of 1,185, and Ohio State Penitentiary's 436 inmates committed 508 Rule 14 violations.  (*Id.*).

248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV.    ANALYSIS

### A.    MOTION TO EXCLUDE EVIDENCE

Plaintiffs attached four documents to their brief in opposition to ODRC's motion for summary judgment. The first two documents are affidavits from both Plaintiffs. (Doc. Nos. 77-1 and 77-2). The third is the expert report of Dr. Susan Jones in *Howard v. Cook County Sheriff's Office*, a 2017 case filed in the United States District Court for the Northern District of Illinois, Eastern Division. (Doc. No. 77-3). That case involved inmate sexual misconduct similar to that underlying this case, and Dr. Jones's report discusses the defendant's allegedly insufficient response to that misconduct. (*Id.*). The fourth document is a settlement agreement entered into by the parties in *United States v. Mobile County Sheriff Paul Burch*, a 2021 case filed in the United States District Court for the Southern District of Alabama, Southern Division, in which the defendant did not admit liability but agreed to implement certain measures to address inmate sexual misconduct. (Doc. No. 77-4). ODRC moved to exclude the expert report and the settlement agreement pursuant to Rule 37(c) because Plaintiffs did not disclose them as required by Rule 26. (Doc. No. 80).

Under Rule 26, parties must disclose information regarding "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses," as well as supplement its disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(a)(1)(A)(i) and (e)(1)(A).

A party that fails to comply with these rules "is not allowed to use" the information that was not disclosed "on a motion, at a hearing, or at a trial, unless the failure was substantially justified or

11

is harmless." Fed. R. Civ. P. 37(c)(1).  The burden falls on the non-disclosing party to show its violation of Rule 26(a) was either substantially justified or harmless.  *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).

Plaintiffs do not dispute that they did not disclose the expert report and the settlement agreement.  They instead argue they were not required to disclose their intent to rely on the expert report and the settlement agreement because they are public documents in cases about which the parties previously communicated.  (Doc. No. 82 at 4-5, 7).

But Plaintiffs have not shown I may take judicial notice of the contents of those documents. Take the settlement agreement for example.  While Federal Rule of Evidence 201 may permit me to take judicial notice of the fact that agreement was filed as a matter of public record, I may only take judicial notice of the truth of the contents of that agreement if those contents are "not subject to reasonable dispute because [they are] . . . generally known within the trial court's territorial jurisdiction[,] or . . .can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).

And the Sixth Circuit has noted, in the context of a motion to dismiss, that a court "'may take judicial notice of another court's opinion not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008) (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3rd Cir. 1999)).  *See also McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) ("Judicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion.") (citation and internal quotation marks omitted).

In opposing ODRC's motion for summary judgment, Plaintiffs contended the expert report and the settlement agreement identify "numerous other remedial measures that could be taken and that Defendant has not considered." (Doc. No. 77 at 36 n.21). They represent they offered these documents "as persuasive authority that Defendant has not properly protected Plaintiffs and other female employees and[,] therefore, has violated its obligations under Title VII." (Doc. No. 82 at 4). But the question of whether Defendant adequately protected Plaintiffs is the core of the parties' dispute. It is not appropriate for me to take judicial notice of the facts contained in these two documents when those facts are offered to show Plaintiffs' "arguments and allegations against Defendant[] are true." *Missud v. Nevada*, 861 F. Supp. 2d 1044, 1054 (N.D. Cal. 2012), *aff'd*, 520 F. App'x 534 (9th Cir. 2013).

Plaintiffs also contend they were not required to disclose these documents because they are protected attorney work product. (Doc. No. 82 at 5). The work product doctrine "protects from discovery documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative." *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006). Plaintiffs do not explain how the expert report and the settlement agreement fit into this category, as neither they nor their counsel had any apparent role in the preparation of those documents.

Plaintiffs did not disclose documents they were required to disclose prior to the discovery deadline under Rule 26(a), so they must show their failure to disclose was substantially justified or harmless. The Sixth Circuit has adopted the following five factors for consideration in making that determination:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015).

13

Plaintiffs contend ODRC should not have been surprised by their use of the expert report and the settlement agreement because "Defendant knew of both cases and was capable of searching the docket and/or the Court orders in those cases in order to identify these other remedial measures . . . ." (Doc. No. 82 at 6).  In Plaintiffs' view, because there was no surprise, there is nothing to cure. (*Id*.).  They note there is no trial date set for this case and argue there is no need to reopen discovery. (*Id*. at 6-7).  As to the fourth factor, Plaintiffs assert these documents "are important to impeach Defendant's characterization that it has taken appropriate steps to address Rule 14 violations."  (*Id*. at 7).  And, finally, Plaintiffs explain that they did not disclose these documents because they believed the Federal Rules of Civil Procedure do not require disclosure.  (*Id*.).

Plaintiffs have not met their burden to show their failure to disclose was substantially justified.  Plaintiffs were required to disclose their potential reliance on these documents as evidence in support of their claims.  There is not an automatic exception for public records and Plaintiffs have not offered a plausible basis upon which I could take judicial notice of the contents of the documents they offer.  Moreover, these documents address concerns arising from different facts in different correctional facilities in different states.  Whether the strategies discussed in those documents are reasonable responses to inmate sexual misconduct in those circumstances is of limited relevance to the circumstances in this case.

Plaintiffs also have not shown their failure to disclose was harmless.  As the Sixth Circuit has noted, harmlessness in the context of Rule 37 typically involves an "inadvertent omission" or a "honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party."  *Howe*, 801 F.3d at 747 (citations and internal quotation marks omitted).  To the contrary, Plaintiffs' nondisclosure appears to have been intentional, based upon an (ultimately incorrect) view that the documents were admissible even without disclosure.

14

I conclude Plaintiffs have not shown I may take judicial notice of the contents of the expert report and the settlement agreement and have not shown that their failure to disclose these documents in discovery was substantially justified or harmless. Therefore, I grant ODRC's motion to exclude these two documents.

## B. SEXUALLY HOSTILE WORK ENVIRONMENT

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, condition, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Plaintiffs assert ODRC violated Title VII by forcing them to work in a sexually hostile work environment.

"In order to establish a hostile work environment claim, an employee must show the following:

> 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior."

*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000) (citing *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999)). To create a hostile work environment, sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). The challenged "conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (citations and quotation marks omitted). A court considering whether "alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment . . . must consider the totality of the circumstances." *Williams*, 187 F.3d at 562 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

ODRC implicitly concedes there is sufficient evidence to support the first three elements of Plaintiffs' hostile work environment claim, as it argues only that Plaintiffs cannot establish the fourth or fifth elements of their hostile work environment claim. (Doc. No. 72 at 30-41).

### 1. Sexually Hostile Work Environment

ODRC argues Plaintiffs have not presented evidence that they were subjected to a hostile work environment at ToCI because "[a]s crude and unacceptable as the alleged behavior is, the case law establishes that sexually harassing conduct by incarcerated persons toward staff does not, standing alone, create a sexually hostile work environment." (*Id.* at 33) (citations omitted).

But Plaintiffs do not rely on the Rule 14 violations alone. They also offer evidence that their reports of Rule 14 violations were minimized, dismissed, and even used against them by supervisors and co-workers.

Good averred that when she reported an inmate to a lieutenant for masturbating in front of her and verbally taunting her, the lieutenant "responded, 'Well, I was masturbating myself, the office here, just knowing you were in the area.'" (Doc. No. 77-2 at 5). She also testified that, during a conversation between a unit manager and several inmates held near Good, the unit manager jokingly referenced statements Good made in a Rule 14 conduct report and "made fun of [her] in front of [the] inmates." (Doc. No. 56 at 102). (*See also* Doc. No. 77-2 at 4, 18). At other times, lieutenants yelled at her for writing conduct and incident reports related to Rule 14 violations. (Doc. No. 56 at 104-05). According to Good, her supervisors and her fellow officers told her "to just ignore" Rule 14 violations and, when she did file conduct reports, "nothing" was done. (*Id.* at 94). Moreover, both Good and Leedy assert they often receive no response when they place a radio call for assistance with an inmate who is actively committing a Rule 14 violation. (*See, e.g., id.* at 153-55, 158-59; Doc. No. 77-1 at 4-5). I conclude a reasonable corrections officer would consider this environment "hostile or abusive." *Harris*, 510 U.S. at 21.

16

Further, both Plaintiffs have offered evidence they subjectively viewed their work environment as abusive. (*See, e.g.,* Doc. No. 56 at 130) (Good testifying she "didn't feel safe at the institution anymore" because of her "coworkers and [the] administration" "repeatedly ignored" her requests for help while an inmate was committing "a sex crime on [her]"); (Doc. No. 77-1 at 9) (Leedy describing "actions" of an inmate committing a Rule 14 violation as "predatory and menacing"); (*id.* at 11) (Leedy describing inmate's "continued sexual harassment" of her).

There is no doubt prisons present an atypical setting for a hostile work environment claim, as "corrections personnel have accepted the probability of deviant behavior" from individuals who already have demonstrated a willingness to violate the law. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 734 (6th Cir. 2006). But as the *Randolph* court noted, this principle "is not without limit." *Id.* The record evidence, when viewed in the light most favorable to Plaintiffs, establishes a genuine issue of material fact as to whether the sexual harassment they faced was sufficiently pervasive to constitute a hostile work environment.[5]

### 2. ODRC's Liability

ODRC argues Plaintiffs cannot establish the fifth element of their claim. A prison system may be held liable for inmates' sexual harassment if it "'fail[ed] to take appropriate steps to remedy or prevent illegal inmate behavior.'" *Id.* at 735 (quoting *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000)) (alteration by *Randolph*).

ODRC points to a long list of actions it took "to address Rule 14 violations by incarcerated persons:

- The Director of the Department issued two videos to staff encouraging them to report Rule 14 violations, emphasized her support for staff who felt victimized, and detailed her efforts to ensure that individuals sentenced under Senate Bill 201, the

---

[5] Plaintiffs also offer evidence that inmates repeatedly subjected them to threats of sexual violence while committing Rule 14 violations. Because the Supreme Court has framed the hostile work environment inquiry in the disjunctive, I need not determine whether Plaintiffs have established a genuine dispute of material fact as to whether the harassment was severe. *Meritor*, 477 U.S. at 67.

Reagan Tokes Law, could have their sentences increased if found guilty of Rule 14 violations;

- Increased prison sentences, when possible, for Rule 14 violators under the Reagan Tokes Law;

- Referred conduct reports alleging Rule 14 violations to the RIB and created a sanctions grid for the RIB to follow;

- Implemented a series of harsher restrictions of certain privileges that incarcerated persons typically enjoy;

- Allowed for security increases for individuals who engage in Rule 14 violations;

- Created a Rule 14 committee at ToCI to allow employees to be involved in addressing Rule 14 issues and brainstorm as to best practices and solutions for Rule 14 violation issues, including developing policies to improve Rule 14 compliance;

- Issued new sanctions such as sliders and magnets on doors, and jumpsuits;

- Trained staff on completing conduct and incident reports and on Rule 14 violations, in general;

- Attempted to and did refer Rule 14 violations for prosecution; and

- Created binders and sanction information sheets to assist staff with ensuring that incarcerated persons were following imposed sanctions."

(Doc. No. 72 at 34-35).[6]

But it is not enough for an employer to maintain policies designed to reduce sexual harassment and related misconduct; the employer also must "*enforce*[] its policy." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685 (6th Cir. 2005) (emphasis in original).  Plaintiffs have offered sufficient evidence to create a genuine dispute of material fact regarding whether ODRC did so.

Good testified ODRC did not "follow through" on the various remedial actions it identified: "They don't make sure that things are being followed through and if not, somebody's being held accountable for it. They're not supporting you."  (Doc. No. 56 at 162).  She continued:

Nobody's following through on the binder and the paperwork, nobody's following through on the magnets or the sliders. Nobody's following through on the

---

[6]  The parties disagree about when and why ODRC adopted these responses.  But I need not resolve that dispute because it is not material to Plaintiffs' hostile work environment claim.

jumpsuits, nobody's following through on making sure that these guys keep their
sanctions, they['re] letting them off early.

(*Id.* at 163).

According to Good, ToCI is "never in compliance [with] those sanctions."  (*Id.* at 164).
Leedy echoed these statements, testifying that the sanctions are not consistently enforced.  (Doc.
No. 54 at 143).

This testimony, viewed in the light most favorable to Plaintiffs, raises a genuine dispute of
material fact as to whether ODRC took reasonable care to "'remedy or prevent illegal inmate
behavior.'"  *Randolph*, 453 F.3d at 735 (quoting *Slayton*, 206 F.3d at 677).  Therefore, I conclude
ODRC has not met its burden under Rule 56.

## V.    CONCLUSION

For the reasons stated above, I grant the motion of Defendant the Ohio Department of
Rehabilitation and Correction to exclude evidence offered by Plaintiffs Carla Good and Suzanne
Leedy, as well as the parties' motions for leave to file additional briefing.  (Doc. Nos. 80, 83, and 85).
I deny Defendant's motion for summary judgment.  (Doc. No. 72).


So Ordered.


s/ Jeffrey J. Helmick
United States District Judge